United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFREDO GONZALEZ,<br><br>Plaintiff,<br><br>v.<br><br>F. TUVERA, et al.,<br><br>Defendants. | Case No. 16-cv-02294-JST<br><br>**ORDER DENYING DEFENDANTS'**<br>**MOTION FOR SUMMARY**<br>**JUDGMENT; STAYING ACTION AND**<br>**REFERRING FOR SETTLEMENT**<br>**PROCEEDINGS; DIRECTIONS TO**<br>**CLERK**<br><br>Re: ECF No. 25 |

Plaintiff, a former California state prisoner, has filed a *pro se* complaint under 42 U.S.C. § 1983 alleging that prison officials at Salinas Valley State Prison ("SVSP") violated his constitutional rights when he was housed there. Now pending before the Court is Defendants' motion for summary judgment. ECF No. 25. Plaintiff has filed an opposition and related documents, ECF No. 61; and Defendants have filed a reply, ECF No. 66. For the reasons set forth below, Defendants' motion for summary judgment is DENIED.

## BACKGROUND

On March 28, 2011, while housed at SVSP, Plaintiff was attacked by another inmate, resulting in a severe closed head injury involving a fractured skull, bruising, and internal bleeding. He was treated at San Jose Regional Medical Center where doctors removed a portion of his skull to allow the swelling in his brain to decrease; placed a catheter in his head to help drain the excess fluid; and placed a feeding tube in his stomach through his throat. On April 12, 2011, the flap on Plaintiff's skull was reattached. On April 18, 2011, Plaintiff was discharged and returned to SVSP where he was admitted to the prison hospital. Compl. at 4; ECF No. 1-2 at 2-10; Kumar Decl. ¶¶ 3, 4 and Ex. A.

This action challenges the medical treatment that Plaintiff received after his April 2011 return to SVSP. Plaintiff alleges that SVSP medical staff F. Tuvera, E. Bridgnell, Nurse Orfield, D. Bright, T. Wy, and L. Gamboa failed to provide adequate medical care following his emergency skull surgery. Plaintiff further alleges that SVSP medical staff and appeals office officials D. Bright, L. Gamboa, K. Kumar, A. Adams, J. Dunlap, J. Villafuerte, E. Talanoa, E. DelaRosa, F. Mejia, J. Turner, and M. Ulloa also denied him adequate medical care when they denied and/or mishandled his inmate healthcare appeals and staff complaints requesting proper treatment. Plaintiff also alleges that Defendant Tuvera retaliated against him for filing inmate appeals by prescribing psychotropic medications that Defendant Tuvera misrepresented as pain medications after Plaintiff specifically informed defendant F. Tuvera that he would not take psychotropic medications because they made him suicidal.

Defendants seek summary judgment on the following grounds. Defendants alleged that they treated Plaintiff in accordance with the recommendations of specialists in the field, and that therefore, as a matter of law, Plaintiff cannot establish that Defendants' reliance on expert opinion violated the Eighth Amendment. Defendants also argue that Plaintiff's refusal to take psychotropic medications is a difference of opinion between an inmate and a medical professional as to his treatment which, as a matter of law, does not state an Eighth Amendment violation. Defendants also argue that Plaintiff's claim against Defendant Orfield is barred by the statute of limitations. In the alternative, Defendants argue that they are entitled to qualified immunity.

## DISCUSSION

### I. Summary Judgment Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Plaintiff's complaint is made under penalty of perjury, so the Court considers the facts in that document in deciding the summary judgment motion.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631. If the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

## II.    Statute of Limitations

Defendants argue that the statute of limitations for Plaintiff's complaint regarding Defendant Orfield's actions on July 11, 2011 expired on July 11, 2015, more than a year before

Plaintiff filed this action on April 19, 2016.[1]  ECF No. 25 at 17-18.  Plaintiff argues that the statute of limitations did not begin to run until he exhausted his administrative remedies on January 8, 2015, and that his claim against Defendant Orfield is therefore timely.  ECF No. 61 at 21-22.

### A.      Factual Background

The following facts are undisputed unless otherwise noted.

Grievance No. SVSP-IA-C-11-12618, which grieves the medical treatment provided by Defendant Orfield on July 11, 2011, was filed on August 24, 2011.  Comp at 14; ECF No. 1-4 at 23.  Plaintiff did not receive any response to this grievance, despite submitting a Form 22 requesting a status update on February 26, 2012.  ECF No. 1-4 at 24; ECF No. 1-7 at 5.

On May 12, 2013, Plaintiff filed Grievance No. SVSP-HC-13049050, which again grieved the medical treatment provided by Defendant Orfield on July 11, 2011.  Compl. at 23; ECF No. 1-4 at 27-30.  On May 28, 2013, Grievance No. SVSP-HC-13049050 was cancelled on the grounds that it duplicated a prior grievance.  ECF No. 1-4 at 26.

On June 20, 2013, Plaintiff filed Grievance No. SVSP-SC-13001402 which challenged the cancellation of Grievance No. SVSP-HC-13049050.  Compl. at 27; ECF No. 1-5 at 29-32.  On September 13, 2013, a second level response was issued which acknowledged that the grievance claimed that RN Orfield assaulted Plaintiff when cleaning his ear, and that Defendant Talanoa refused to address Plaintiff's prior grievance regarding RN Orfield's misconduct.  ECF No. 1-5 at 33-34.  The second-level response found that staff did not commit misconduct.  ECF No. 1-5 at 33-34.  On December 16, 2010, Office of Appeals Chief Zamora issued a third level response that acknowledged that SVSP had *inter alia* inadequately addressed the allegations in Grievance No. SVSP-HC-13049050 and ordered that Grievance No. SVSP-HC-13049050 be accepted and processed as a staff complaint appeal, and that a confidential inquiry be conducted if necessary.  ECF No. 1-5 at 27-28.  Grievance No. SVSP-HC-13049050 was renumbered SVSP-SC-14001419,

---

[1] Pursuant to the prisoner mailbox rule, because Plaintiff is a prisoner proceeding *pro se*, Plaintiff's complaint is deemed filed as of the date he submitted it to prison authorities for mailing to the court. *See Stillman v. LaMarque*, 319 F.3d 1199, 1201 (9th Cir. 2003) (holding that federal or state habeas petition deemed filed on date submitted to prison authorities for forwarding to court, rather than on date received by court).  Plaintiff executed a proof of service on April 19, 2016.  ECF No. 1 at 71.

and a first/second level response was issued on February 27, 2014. ECF No. 1-4 at 21-22.

However, this response was not timely issued to Plaintiff. Plaintiff received this response on or

around September 19, 2014. ECF No. 1-4 at 25. Plaintiff made multiple attempts to determine

why he had received no response to Grievance No. SVSP-SC-14001419. On May 22, 2014; June

17, 2014; and July 24, 2014, he filed Form 22s requesting a status update. ECF Nos. 1-4 at 15-17.

On July 24, 2014, he filed Grievance No. SVSP-HC-14051465 in an attempt to determine why

SVSP-SC-14001419 had not been returned to him. ECF Nos. 1-4 at 1-14. Plaintiff received a

third level response to Grievance No. SVSP-SC-14001419 on January 8, 2015. ECF No. 1-4 at

18-21.

## B.        Section 1983 Statute of Limitations Standard

Section 1983 does not contain its own limitations period. The appropriate period is that of

the forum state's statute of limitations for personal injury torts. *See Wilson v. Garcia*, 471 U.S.

261, 275 (1985), *superseded by statute on other grounds as stated in Jones v. R.R. Donnelley &*

*Sons Co.*, 541 U.S. 369, 377-78 (2004); *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). In

California, the general residual statute of limitations for personal injury actions is the two-year

period set forth at section 335.1 of the California Code of Civil Procedure. Cal. Civ. Proc. § 335.1

(current codification of residual limitations period, which is now two years; enacted in 2002).

Section 335.1 therefore sets forth the applicable statute of limitations for § 1983 actions brought in

California. *See Maldonado v. Harris*, 370 F.3d 945, 954 (9th Cir. 2004) (applying California's

prior one-year statute of limitations to the § 1983 action).

A federal court must also give effect to a state's tolling provisions. *See Hardin v. Straub*,

490 U.S. 536, 542-44 (1989). In California, this includes tolling the statute of limitations during

imprisonment and while criminal charges are pending. The statute of limitations begins to run

immediately after the recognized disability period ends. *See Cabrera v. City of Huntington Park*,

159 F.3d 374, 378-79 (9th Cir. 1998). Section 352.1 of the California Code of Civil Procedure

recognizes imprisonment as a disability that tolls the statute of limitations when a person is

"imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term

of less than for life . . . ." Cal. Civ. Proc. § 352.1(a). The tolling is not indefinite, however; the

disability of imprisonment delays the accrual of the cause of action for a maximum of two years. *See id.*; *Fink v. Shedler*, 192 F.3d 911, 916 (9th Cir. 1999) *as amended on denial of reh'g and reh'g en banc* (1999). Thus, an inmate has four years to bring a § 1983 claim for damages in California, i.e., the regular two-year period under section 335.1, plus two years during which the accrual is postponed due to the disability of imprisonment as set forth in section 352.1. The disability of imprisonment only delays the accrual of claims for damages under § 1983 and does not delay the accrual of claims for injunctive and declaratory relief under § 1983. Cal. Civ. Proc. § 352.1(c). In addition, under California law, when "the exhaustion of administrative remedies is a prerequisite to the initiation of a civil action," tolling of the limitations period is automatic. *Elkins v. Derby*, 12 Cal.3d 410, 414 (Cal. 1974). Accordingly, the statute of limitations is also tolled for the period in which a prisoner administratively exhausts his underlying grievances pursuant to the requirements of the Prison Litigation Reform Act ("PLRA"). *See Brown v. Valoff*, 422 F.3d 926, 942-43 (9th Cir. 2005) ("the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process").

The PLRA's exhaustion requirement requires "proper exhaustion" of available administrative remedies, "which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford v. Ngo*, 548 U.S. 81, 90, 93 (2006) (citing *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91.

The California Department of Corrections and Rehabilitation ("CDCR") provides its inmates and parolees the right to file a grievance regarding "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." 15 Cal. Code Regs. § 3084.1(a). The CDCR also provides its inmates the right to file grievances alleging misconduct by correctional officers. *Id.* at § 3084.9(i). In order to exhaust available administrative remedies within this system, a prisoner must submit his complaint on CDCR Form 602 and proceed through

three levels of review: (1) screening at the first level of review by a prison official who did not participate in the event at issue and who is of equivalent or higher rank than the participating staff, unless the first level review is exempted, (2) a second level review by a hiring authority or designee at a level no lower than Chief Deputy Warden, Deputy Regional Parole Administrator, or the equivalent; and (3) a third level review by a designated representative under the supervision of the third level Appeals Chief or equivalent. *Id.* § 3084.7. The third level of review exhausts administrative remedies. *Id.* § 3084.7(d)(3); *see also Jackson v. Fong*, 870 F.3d 928, 933 (9th Cir. 2017) ("Administrative exhaustion within California requires the completion of the third level of administrative review.").

### C. Analysis

As detailed *supra* in the factual background, while Plaintiff promptly grieved Defendant Orfield's alleged assault by filing Grievance No. SVSP-IA-C-11-12618 on August 24, 2011, this grievance was not decided at the third level until over three years later, on January 8, 2015, despite multiple efforts by Plaintiff to have the grievance addressed. The delay in processing the appeals was not due to any error on Plaintiff's part, but was because prison officials either lost the grievances or took months to issue a response.

As a prisoner, Plaintiff has four years to bring a § 1983 claim for damages in California, i.e., the regular two-year period under section 335.1, plus two years during which accrual is postponed due to the disability of imprisonment as set forth in section 352.1. Cal. Civ. Proc. §§ 335.1, 352.1(c). The statute of limitations is also tolled for the time period during which Plaintiff's grievance was being reviewed. The statute of limitations therefore began on July 11, 2011 and ran until August 24, 2011. It was tolled from August 24, 2011 to January 8, 2015, almost three years and four months, while Plaintiff satisfied the PLRA's exhaustion requirement. When the instant action was filed on April 19, 2016, approximately eighteen months of the limitations period had run. Plaintiff's Eighth Amendment claim against RN Orfield is therefore timely. Defendants' motion to dismiss the claim against Defendant Orfield action as barred by the statute of limitations is DENIED.

/ / /

### III.    First Amendment Retaliation Claim

Plaintiff alleges that Defendant Tuvera prescribed him psychotropic medication in retaliation for his frequent grievance activity.  Defendant Tuvera argues that he is entitled to summary judgment because he prescribed the psychotropic medication for a legitimate penological goal.

#### A.    Factual Background

The following facts are undisputed unless otherwise indicated.

Between April 2011, when Plaintiff returned from San Joaquin Regional Medical Center, and May 23, 2013, when Defendant Tuvera first prescribed psychotropic medications, Plaintiff filed at least nine grievances regarding his treatment.

On June 6, 2011, Plaintiff submitted Grievance No. SVSP-HC-11044340 (originally numbered SVSP-32-C-11-12242) which alleged that Defendant Tuvera was deliberately indifferent to his serious medical needs when he discharged Plaintiff from the prison hospital on May 11, 2011.  Compl. at 9; ECF No. 1-5 at 89-100; ECF No. 1-6 at 1.

On July 31, 2011, Plaintiff submitted Grievance No. SVSP-HC-11044504 (originally numbered SVSP-32-11-12434) which alleged that Defendant Bridgnell improperly denied Plaintiff medical treatment on July 11 and 15, 2011.  Compl. at 14; ECF No. 1-6 at 2-14.

On August 24, 2011, Plaintiff submitted Grievance No. SVSP-IA-C-11-12618 which alleged that Defendant Orfield had assaulted him on July 11, 2011.  Compl. at 14; ECF No. 1-4 at 23.

On December 26, 2012, Plaintiff submitted Grievance No. SVSP-SC-13001326 which alleged that Defendant Wy provided inadequate medical treatment on December 4, 2012.

On February 5, 2013, Plaintiff resubmitted Grievance No. SVSP-HC-C-11-12618.

On April 5, 2013, Plaintiff submitted Grievance No. SVSP-HC-13048834 which alleged that he was inappropriately prescribed Gabapentin which caused severe negative side effects that SVSP doctors refused to treat; that SVSP medical was inadequately staffed in that there was not a primary care physician available twenty-four hours a day; and that SVSP medical staff was refusing to treat his headaches.  ECF No. 1-5 at 53-63.

8

On April 23, 2013, Plaintiff submitted Grievance No. SVSP-HC-13048933 which challenged the cancellation of Grievance No. SVSP-HC-13001326. ECF No. 1-5 at 36-45.

On or about May 10, 2013, Plaintiff submitted at least two grievances. Grievance No. SVSP-HC-13049051 (intended to be a resubmission of Grievance No. 32-C-11-12618) alleged again that Defendant Orfield had assaulted him on July 11, 2011. Grievance No. SVSP-HC-14001420 (originally numbered SVSP-SC-13049051) challenged Defendant Talanoa's processing of Grievance No. SVSP-HC-11044504. Compl. at 23, 66. ECF No. 1-5 at 18-26.

During that same time period, Plaintiff filed at least three Form 22s (Request for Services) related to his grievance activity. On November 9, 2011, Plaintiff filed a Form 22 requesting a statue update for Grievance No. SVSP-IA-C-11-12618. ECF No. 1-7 at 3. On February 26, 2012, Plaintiff again filed a Form 22 requesting a statue update for Grievance No. SVSP-IA-C-11-12618. ECF No. 1-7 at 5. On March 23, 2012, Plaintiff filed a Form 22 requesting clarification regarding a notification of lost appeal. ECF No. 1-7 at 8.

Prison medical staff were aware that Plaintiff had filed grievances against prison medical staff. Compl. at 7, 11-13.

On May 23, 2013, Plaintiff was seen by Defendant Tuvera in response to his Plaintiff's complaint that he was experiencing severe head pain. ECF No. 1-14 at 18. Defendant Tuvera and Dr. Bright had discussed Plaintiff's case and noted that the overuse of painkillers was a common contributor to post-traumatic headaches. ECF No. 1-14 at 18. Defendant Tuvera noted that Plaintiff was already on propranolol, which is commonly prescribed to treat migraine headaches. ECF No. 1-14 at 18. Defendant Tuvera recommended that Plaintiff start a daily 25 mg dose of amitriptyline. ECF No. 1-14 at 18. Plaintiff informed Defendant Tuvera that he refused to take any psychotropic medication because his previous experience with another psychotropic, Elavil, had caused him to feel depressed and suicidal. Compl. at 24. Defendant Tuvera responded, "This is amitriptyline, not Elavil" and stated that amitriptyline taken in conjunction with propranolol would alleviate the pain and sensation of numbness. Defendant Tuvera showed Plaintiff a memorandum from Defendant Bright recommending this treatment plan. Compl. at 24. Plaintiff started on the amitriptyline, but, like the Elavil, it made him feel depressed and suicidal. The

1    amitriptyline also did not alleviate the pain, numbness or the feeling of movement and popping in

2    his skull.  Compl. at 26.

3        Amitriptyline is a tricyclic antidepressant and is prescribed for mental health issues, but it

4    is also approved by the CDCR to treat other issues such as neuropathic pain, urinary incontinence,

5    and migraine headaches.  ECF No. 1-4 at 89.

6        On June 17, 2013, Plaintiff had another appointment with Defendant Tuvera.  He informed

7    Defendant Tuvera that the amitriptyline was causing him to feel depressed and suicidal, and that

8    he had not seen any improvement in his symptoms.  He asked Defendant Tuvera if amitriptyline

9    was a psychotropic, and Defendant Tuvera denied it.  He asked Defendant Tuvera if he was

10   actually being prescribed Elavil, and Defendant Tuvera denied it and stated that amitriptyline was

11   a pain medication which is why it was crushed before administered to Plaintiff.  Compl. at 26.

12   Defendant Tuvera stated that what Plaintiff was feeling was normal, and that he should give the

13   amitriptyline-propranolol combination a month or so, and then Plaintiff would see an

14   improvement.  Compl. at 26.

15       On July 10, 2013, Plaintiff learned from his psychologist that amitriptyline is a

16   psychotropic medication, and is another name for Elavil.  Compl. at 27.

17       On July 16, 2013, Plaintiff was seen by Defendant Tuvera.  He again informed Defendant

18   Tuvera that the amitriptyline caused him to feel depressed and suicidal and was not alleviating any

19   of his other medical issues.  He again asked Defendant Tuvera if amitriptyline was a psychotropic

20   and if it was Elavil.  Defendant Tuvera dodged the question and referred Plaintiff to Defendant

21   Bright's memo.  Defendant Tuvera stated that he was just doing his job, and that it was Defendant

22   Bright who had decided on Plaintiff's course of treatment.  Compl. at 27.

23       Despite Plaintiff's documented repeated refusals to take amitriptyline, the prescription was

24   not discontinued for at least forty-five days.  ECF No. 61 at 13.

25       On July 28, 2013, Plaintiff filed Grievance No. SVSP-HC-13049513 alleging that

26   Defendants Tuvera and Bright subjected him to psychotropic medication without his consent.

27   Compl. at 28; ECF No. 1-4 at 89-92; ECF No. 1-5 at 1-6.

28       On February 13, 2014, Defendant Tuvera prescribed Depakote to treat Plaintiff's

10

headaches, claiming that the neurologist had recommended the medication. Compl. at 36. Plaintiff again asked Defendant Tuvera if Depakote was a psychotropic, and Defendant Tuvera denied it, stating that it was a pain medication. Compl. at 36. Soon after starting Depakote, Plaintiff became depressed and suffered suicidal ideations. On February 25, 2014, Plaintiff learned from Dr. Bonilla that Depakote is a psychotropic medication. Compl. at 36.

Starting February 20, 2014, Plaintiff stopped taking Depakote because he felt suicidal. ECF No. 25-1 at 84; ECF No. 61 at 13. Plaintiff refused the medication on five separate occasions (February 20, February 22, March 8, March 13 and April 4), but the medication was not discontinued until April 9, 2014. ECF No. 61 at 13, 131-35.

Prior to the February 2014 appointment with Defendant Tuvera, Plaintiff last saw a neurologist on September 3, 2013, when he was examined via telemedicine by Dr. Jumao-As, a neurologist and outside specialist consulted by SVSP. Kumar Decl. ¶ 11 and ECF No. 25-1 at 81-82. Dr. Jumao-As' notes do not reflect a recommendation for Depakote.

### B.      Standard

Retaliation by a state actor for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). The prisoner must show that the type of activity he was engaged in was constitutionally protected, that the protected conduct was a substantial or motivating factor for the alleged retaliatory action, and that the retaliatory action advanced no legitimate penological interest. *Hines v. Gomez*, 108 F.3d 265, 267-68 (9th Cir. 1997) (inferring retaliatory motive from circumstantial evidence). The prisoner bears the burden of pleading and proving absence of legitimate correctional goals for the conduct of which he complains. *Pratt*, 65 F.3d at 806. At that point, the burden shifts to the prison official

to show, by a preponderance of the evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose. *See Schroeder v. McDonald*, 55 F.3d 454, 461-62 (9th Cir. 1995) (defendants had qualified immunity for their decision to transfer prisoner to preserve internal order and discipline and maintain institutional security).

In a retaliation analysis, the court should apply the four-factor test from *Turner v. Safley*, 482 U.S. 78 (1978), to determine whether the proffered legitimate penological interest is reasonably related to a regulation which infringes on a prisoner's constitutional rights. *See Brodheim v. Cry*, 584 F.3d 1262, 1271-72 (9th Cir. 2009) (inmate appeal response that warned the inmate "to be careful what you write" was insufficiently related to penological interests to defeat retaliation claim). Prison officials cannot simply articulate a general justification for their actions, they must show why their particular action was reasonably related to the legitimate interest. *Shephard v. Quillen*, 840 F.3d 686, 692 (2016) (defendants must show that they placed plaintiff in administrative segregation because there were witnesses in general population whom he could have improperly influenced; not enough to simply assert that administrative segregation generally helps keep prisoners safe and investigations untainted). Courts must also consider whether there were ready alternatives to the retaliatory action for achieving the governmental objectives. *Brodheim*, 584 F.3d at 1272.

**C.      Discussion**

Defendants argue that Plaintiff cannot establish retaliation because the psychotropic medicines were prescribed for the legitimate correctional goal of treating Plaintiff's symptoms. They state that Defendant Tuvera never forced Plaintiff to take the medication and never refused to discontinue the prescription.

Defendants mischaracterize this claim. Plaintiff's claim is that regardless of whether these psychotropic medications are appropriate for treating headaches, falsely stating that they were not psychotropic medications after learning that Plaintiff would not take psychotropic medications because they caused severe side effects for him does not reasonably advance a legitimate correctional goal.

Defendants also mischaracterize the evidence. While Defendant Tuvera did not force

Plaintiff to take either medication, he caused Plaintiff to take both medications — despite Plaintiff's stated objections — by falsely stating that they were not psychotropic. While Defendant Tuvera did not refuse to discontinue the prescriptions, he did refuse to immediately discontinue the prescriptions after Plaintiff expressed his refusal to take the medications. These medications were offered to Plaintiff for at least six weeks after he first refused to take them, and continue to be offered despite Plaintiff's repeated refusals.

In addition, there were other alternatives for treating Plaintiff's head pain, as is evident from Plaintiff's health records which show that he was prescribed medications that would treat seizures, epilepsy, high blood pressure, and pain. *See, e.g.*, ECF No. 25-1 at 92, 117.

Viewing the evidence presented in the light most favorable to Plaintiff, there is a genuine dispute as to (1) whether Defendant Tuvera prescribed amitriptyline and Depakote in retaliation for Plaintiff's protected conduct, given the proximity in time between the protected conduct and the prescription and Defendant Tuvera's misrepresentation of the medications, *see Shepherd*, 840 at 690 (evidence probative of retaliatory animus includes proximity in time between the protected speech and the alleged adverse action); and (2) whether prescribing amitriptyline and Depakote to treat Plaintiff's headaches, given Plaintiff's clear objections and his documented history of adverse reactions to psychotropic medications, reasonably advanced the goal of treating Plaintiff's symptoms, where there were other ready alternatives, *see Brodheim*, 584 F.3d at 1272. Defendant Tuvera is not entitled to summary judgment on this First Amendment retaliation claim unless he is entitled to qualified immunity.

## IV.     Eight Amendment Claims

Defendants do not dispute that Plaintiff's headaches and loose skull flap constituted serious medical needs. With respect to Plaintiff's allegation that Defendants Wy, Bridgnell, Orfield, Tuvera, Bright, and Gamboa failed to provide adequate medical care following Plaintiff's emergency skull surgery, Defendants argue that Plaintiff cannot establish deliberate indifference because they consistently arranged for specialists to treat Plaintiff's recurring headaches; they consistently acted in accordance with the specialists' opinions; and Plaintiff's disagreement with treating his headaches with medication is a difference of opinion between an inmate and his

13

medical care provider which, as a matter of law, does not amount to deliberate indifference. Defendants also argue that, with respect to the medical treatment provided for Plaintiff's loose skull flap, they reasonably relied on Dr. Rahimifar's 2011 determination that there was no signs of a loose cranial bone flap and did not realize that Plaintiff's recurring complaints of headaches and numbness were related to a loose skull flap. Finally, Defendants argue that the delay in providing him surgery, without more, is insufficient to state a deliberate indifference claim. With respect to Plaintiff's allegation that Defendants Bright, Gamboa, Kumar, Adams, Dunlap, Villafuerte, Talanoa, DelaRosa, Mejia, Turner and Ulloa denied him adequate medical care when they mishandled or denied his inmate healthcare appeals and staff complaints, Defendants argue that these defendants merely affirmed the adequate medical care provided by SVSP medical staff.

a.    Legal Standard

Deliberate indifference to a serious medical need violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *See McGuckin*, 974 F.2d at 1059. A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If a prison official should have been aware of the risk but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016). Mere negligence, or even gross negligence, is

not enough. *Farmer*, 511 U.S. at 835-36 & n.4. A claim of medical malpractice or negligence is insufficient to make out a violation of the Eighth Amendment. *McGuckin*, 974 F.2d at 1059. Nor does "a difference of opinion between a prisoner patient and prison medical authorities regarding treatment" amount to deliberate indifference. *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Consequently, a plaintiff's opinion that medical treatment was unduly delayed does not, without more, state a claim of deliberate indifference. *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctor chose was medically unacceptable under the circumstances and that he chose this course in conscious disregard of an excessive risk to the plaintiff's health. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004).

In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. *See McGuckin*, 974 F.2d at 1060; *Shapley*, 766 F.2d at 407. A finding that the defendant's activities resulted in "substantial" harm to the prisoner is not necessary, however. Neither a finding that a defendant's actions were egregious nor that they resulted in significant injury to a prisoner is required to establish a violation of the prisoner's federal constitutional rights, *McGuckin*, 974 F.2d at 1060, 1061 (citing *Hudson v. McMillian*, 503 U.S. 1, 7-10 (1992) (rejecting "significant injury" requirement and noting that Constitution is violated "whether or not significant injury is evident"), but the existence of serious harm tends to support an inmate's deliberate indifference claims, *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin*, 974 at 1060). A plaintiff need not prove complete failure to treat. Deliberate indifference may be shown where access to medical staff is meaningless as the staff is not competent and does not render competent care. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989).

**a.   Medical Treatment by Defendants Bridgnell, Orfield, and Wy**

**1)   Background**

Defendants do not address the allegedly improper or inadequate medical treatment provided by Defendants Bridgnell, Orfield, and Wy. Accordingly, the following facts are

undisputed unless otherwise noted.

**Treatment by Dr. Bridgnell and RN Orfield.**

On May 19, 2011, Plaintiff was seen by Defendant Bridgnell. Plaintiff informed Defendant Bridgnell that, although he suffered from high blood pressure and migraines, his seizure and pain medications had been discontinued. Defendant Bridgnell stated that Plaintiff's discharge orders prohibited him prescribing Plaintiff blood pressure or migraine medications. Compl. at 6. Plaintiff's discharge orders do not prohibit prescribing medication. Rather, the orders specify that Plaintiff should receive Dilantin (blood pressure medication) twice a day and pain medication as needed. ECF No. 1-2 at 2.

On May 21, 2011, Plaintiff was visited by his parents who expressed concern upon learning that Plaintiff was being denied his medications for pain, seizures, blood pressure, and migraines. Plaintiff's parents stated that they would notify Sacramento (CDCR headquarters) about the denial of medication. Compl. at 6-7.

On May 26, 2011, Plaintiff was called to medical, where Defendant Bridgnell angrily informed Plaintiff that Sacramento had contacted SVSP, stating that Plaintiff's family had complained that Plaintiff was being denied his medications. Plaintiff acknowledged telling his family about the denial of medications. He also informed Defendant Bridgnell that his gauze had not been changed in days, and that he was having difficulty opening his mouth to eat. Defendant Bridgnell instructed Plaintiff to file a request to dental to address the mouth pain, and a request to medical for the change of gauze. That same day, Plaintiff was re-issued his seizure medication (Dilantin/Phenytoin), but not any of his other medications. Compl. at 7.

On May 30, 2011, Plaintiff's blood pressure reached 160/110 and he was found screaming, crying and spinning in pain. Medical staff was notified, and Plaintiff was administered Clonidine and an EKG test. Plaintiff was informed that he would receive his blood pressure medication the next day. Compl. at 7.

On May 31, 2011, Defendant Bridgnell ordered that Plaintiff's Dilantin level be checked, marking the order "urgent," and ordered that Plaintiff be moved to a bottom tier bottom bunk. Compl. at 8.

On June 2, 2011, Plaintiff confronted Defendant Bridgnell about denying his blood pressure medication, and causing the spike in blood pressure on May 30 which could have killed him. Defendant Bridgnell denied that Plaintiff's blood pressure had spiked on May 30, and stated that Plaintiff had suffered a seizure that day, unrelated to his blood pressure, and implied that it was because Plaintiff had overdosed on Dilantin. Plaintiff informed Defendant Bridgnell that he had not taken more than two Dilantin pills a night. Defendant Bridgnell responded that he would know if Plaintiff was lying because he could test Plaintiff's blood. Compl. at 8-9.

On June 6, 2011, Plaintiff filed Grievance No. SVSP-HC-11044340 alleging that Defendant Tuvera was deliberately indifferent to his serious medical needs when he discharged Plaintiff from the prison hospital on May 11, 2011. Compl. at 9. On June 20, 2011, Plaintiff filed Grievance No. SVSP-HC-11044344 alleging that his medical Olsen review was being denied or delayed. Compl. at 10.

On July 10, 2011, Plaintiff filed a medical request (CDCR Form 7362), stating that the right side of his head was swollen and painful, his head was constantly popping on the inside, that it felt like his skull was moving, his left ear was not cleaned and is popping again, and his hearing was bad. He handed the Form 7362 to Medical Tech Assistant ("MTA") Chu who advised him that he would be seen the next day. Compl. at 10.

On July 11, 2011, Plaintiff was called to C-Yard Medical but no one knew why he was there and only knew that he had filed a grievance. Plaintiff states that Defendant Orfield seemed upset about the grievance even though Plaintiff explained that the grievance was against Defendant Tuvera and not against C-Yard Medical. RN Orfield checked Plaintiff's ear and determined that it needed cleaning. Plaintiff and RN Lisa informed Defendant Orfield that Plaintiff had blood in his left ear because he had suffered traumatic brain injury four months earlier, and had craniotomies done in the area where the ear was clogged. Plaintiff agreed to the ear cleaning because he had previously had his ear cleaned without issues. However, when Defendant Orfield flushed water through Plaintiff's left ear, it caused him great pain, which he had not previously experienced during other ear cleanings. Defendant Orfield refused to stop the cleaning despite Plaintiff's repeated requests. Correctional officers Ramey and Reyes asked

Defendant Bridgnell to help Plaintiff, but Defendant Bridgnell refused to see Plaintiff, stating that Plaintiff did not have an appointment and would be seen at his scheduled on appointment on July 15, 2011. Plaintiff waited until his dizziness subsided and stated that if no doctor would see him, he would prefer to return to his cell where he could sleep. Compl. at 11-13.

On July 15, 2011, when Plaintiff arrived at Medical for his scheduled appointment, Defendant Bridgnell refused to see Plaintiff stating that he did not have Plaintiff's file. Plaintiff asked Officer Gonzalez to ask Defendant Bridgnell to see him, to just check Plaintiff's head because it felt like his skull was moving, but Defendant Bridgnell refused Officer Gonzalez's request. Compl. at 13-14.

On July 17, 2011, Plaintiff was taken to the emergency room in response to his complaints of excruciating pain, dizziness, and movement in his skull. Plaintiff also had a high blood pressure of 157/109. Compl. at 14. The following day, Plaintiff was finally seen by Defendant Bridgnell. Plaintiff states that Defendant Bridgnell only saw him because Plaintiff had been sent to the emergency room the previous day. Compl. at 14. Defendant Bridgnell stated that Plaintiff was fine and sent him home. Compl. at 14.

**Treatment by Dr. Wy.** On December 4, 2012, after having filed multiple Form 7362s requesting medical services, Plaintiff was seen by Defendant Dr. Wy. However, Defendant Wy refused to address any of Plaintiff's medical issues. Instead, Dr. Wy mentioned that Plaintiff's bloodwork was off, that Plaintiff should redo his bloodwork, and that Plaintiff would be getting a pneumonia shot. Defendant Wy then tried to rush Plaintiff out of his office, as he did on other occasions. Plaintiff told Defendant Wy that he was suffering severe head pain, dizziness, blurred vision, numbness in the head, and constant popping and cracking in the head. Defendant Wy responded that it was up to the neurosurgeon to address these issues and to address the CT scan. Defendant Wy then told Plaintiff to get out. Compl. at 19.

2) **Analysis**

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is a genuine dispute as to whether Defendants Bridgnell, Orfield, and Wy were deliberately indifferent to Plaintiff's serious medical needs. There is a genuine dispute as to whether Defendant Bridgnell

purposely failed to address Plaintiff's high blood pressure and other medical issues by denying

medication, and refusing to examine Plaintiff. There is also a genuine dispute as whether

Defendant Orfield purposely continued cleaning Plaintiff's ear despite his claims that she was

causing him severe pain. There is also a genuine dispute as to whether Defendant Wy purposely

refused to treat Plaintiff, thereby failing to take reasonable steps to abate risks to Plaintiff's health.

Therefore, defendants Bridgnell, Orfield and Wy are not entitled to summary judgment unless they

are entitled to qualified immunity.

### b. Medical Treatment by Defendants Tuvera, Bright, and Gamboa

#### 1) Background

In support of their summary judgment motion, Defendants identify certain appointments

and tests that they allege establish that, as a matter of law, they were not deliberately indifferent to

Plaintiff's headaches, were unaware of his loose skull flap until late 2016, and reasonably choose

to prescribe him psychotropic medications. In response, Plaintiff argues that many of the

appointments and tests happened only after he had filed numerous grievances or had contacted

CDCR headquarters; that his claims focus on the treatment for his loose skull flap and not his

headaches; that Defendants were aware of his loose skull flap by early 2015 and unreasonably

denied multiple requests in 2015 for examination by a neurosurgeon; and that Defendants

prescribed him psychotropic medications under false pretenses.

The following facts are undisputed unless otherwise noted.

**Prescription of Psychotropic Medications.** For the factual background regarding

Defendant Tuvera's prescription of psychotropic medications, see Section III.A *supra*.

**Medical Treatment Provided by SVSP – 2011 to 2014**

From 2011 to 2014, SVSP medical staff struggled to determine the cause of Plaintiff's

head-related issues. Plaintiff reported feeling pain, dizziness, numbness, a sensation of popping in

the skull, and a sensation that the bone flap was moving.

During this time, Plaintiff was seen by neurosurgeon and outside specialist Dr. Leramo

four times, on September 30, 2011; October 12, 2012; January 18, 2013; and January 23, 2013.

The initial examination was in person and Dr. Leramo conducted a physical examination. The

other appointments were by telemedicine and only in the September 3, 2013, did Dr. Leramo have a nurse conduct a physical examination of Plaintiff. Dr. Leramo was unable to determine the cause of Plaintiff's issues. Dr. Leramo speculated that the cause could be a seizure disorder, migraines, and/or a subdural clot, and prescribed treatment plans and diagnostic tests to address and/or rule out these potential diagnoses. Dr. Leramo did not notice a loose bone flap. Kumar Decl. ¶¶ 5, 8, 10; ECF No. 25-1 at 61-63, 73, 78, 79.

Plaintiff was also seen by neurosurgeon and outside specialist Dr. Rahimifar in person on December 15, 2011. Defendants describe the appointment as follows. Plaintiff reported that he occasionally had localized headaches at the site of the previous craniotomy, occasionally felt a popping noise in his head; no longer felt the bone flap moving; did not have cranial nerve, arm, or leg symptoms; or had not had any seizure activity. ECF No. 25-1 at 65. Dr. Rahimifar conducted a general physical examination and found no evidence that the cranial bone flap was loose, and concluded that Plaintiff "obviously had a very good result from that [craniotomy] surgery." ECF No. 25-1 at 65. Dr. Rahimifar concluded that no immediate neurosurgical intervention was necessary and recommended that Plaintiff continue his current treatment. ECF No. 25-1 at 65. Plaintiff describes the appointment as follows. Dr. Rahimifar saw him for about five minutes until he learned that Plaintiff was a "lifer," i.e. serving a life sentence. ECF No. 61 at 2. Upon hearing this information, Dr. Rahimifar walked out and did not return. ECF No. 61 at 2. A correctional officer inquired as to the status of Plaintiff's appointment and was informed by a nurse that Dr. Rahimifar said he was done. ECF No. 61 at 2.

Plaintiff was also seen three times by neurologist and outside specialist Dr. Jumao-As via telemedicine on September 3, 2013; April 4, 2014; and June 4, 2014. Dr. Jumao-As had a physical examination performed of Plaintiff at the first appointment, but not at subsequent appointments. Dr. Jumao-As was unable to determine the cause of Plaintiff's issues. Dr. Jumao-As speculated that the cause could be intracranial tension, venous sinus thrombosis, increased brain pressure, a swollen optic nerve, Valley Fever, a complicated migraine, subdural hematoma, stroke, cardiac abnormality, hypertension, or spine issues. She prescribed treatment plans and diagnostic tests to address and/or rule out these potential diagnoses. Dr. Jumao-As did not notice

a loose bone flap.  Kumar Decl. ¶¶ 11, 12, 14; ECF No. 25-1 at 81-82, 84-85, 89-90.

Plaintiff was also administered the following diagnostic tests:  an August 11, 2011 CT scan of his brain; a November 15, 2011 CT scan of his brain; a June 19, 2012 x-ray of his cervical spine; a June 22, 2012 MRI of his cervical spine; a March 28, 2013 CT scan of his brain; a 2014 EEG and EKG; and a May 2014 CT scan of his brain with and without contrast.  ECF No. 25-1 at 68-69, 71, 75-76, 87.  Defendants state that none of these diagnostic tests revealed a loose bone flap.  Kumar Decl. ¶ 13, while Plaintiff states that the May 2014 scan shows a loose skull flap, as indicated by Dr. Hetrick's January 27, 2015 reading of the scan.

During this time, Plaintiff was seen by Defendants Tuvera and Gamboa.  At the April and May 2014 appointments with Defendant Gamboa, Defendant Gamboa implemented most of Dr. Jumao-As's recommendations.  On September 10, 2014, Plaintiff asked Defendant Gamboa if he could try medications other than baclofen, oxcarbazepine, amitriptyline, or gabapentin to treat his headache, but Defendant Gamboa denied the request.  ECF No. 25-1 at 96-97.

**Medical Treatment Provided by SVSP – 2015 to 2016**

On January 13, 2015, Dr. Harris physically examined Plaintiff's skull and determined that his skull flap was loose and submitted a request for services ("RFS") for examination by a neurosurgeon.  ECF No. 61 at 3.  In the progress notes for the appointment, Dr. Harris writes: "Craniotomy plates loose?"  ECF No. 61 at 49.  Defendant Gamboa denied this request per the Medical Authorization Committee, and instructed that a series of skull x-rays be ordered instead. ECF No. 61 at 48.

On January 27, 2015, Dr. Hetrick reviewed the May 1, 2014 CT scan of Plaintiff's brain. Dr. Hetrick concluded that the craniotomy flap had not healed and might be loose, and recommended clinical correlation.  Kumar Decl. ¶ 16 and ECF No. 25-1 at 99.

On February 2, 2015, Plaintiff was again seen by Dr. Harris.  Dr. Harris reviewed Dr. Hetrick's report and stated in his progress notes that he suspected a loose craniotomy flap.  ECF No. 61 at 50, 63.  Dr. Harris again submitted an RFS for examination by a neurosurgeon and stated that the principal diagnosis was a loose craniotomy flap.  ECF No. 61 at 51.  Defendant Kumar denied this request: "What is the clinical exam?  Scalp Derm evaluation?  Resubmit."  ECF

No. 61 at 50.

On February 18, 2015, Plaintiff was seen by Nurse Practitioner Hanter. After examining Plaintiff and reviewing his records, NP Hanter submitted an RFS for a scalp dermatology evaluation and stated that the principal diagnosis was a loose craniotomy flap. ECF No. 61 at 53-54. The request was denied by Defendant Kumar, with a notation that NP Hanter should resubmit the RFS and explain what the scalp exam was.

On April 1, 2015, Plaintiff was seen by Defendant Tuvera in response to a complaint of chest pain, headaches, and puffiness on the right side of his face. Kumar Decl. ¶ 17 and ECF No. 25-1 at 103. Defendant Tuvera examined Plaintiff and determined that Plaintiff was not in distress. ECF No. 25-1 at 103. He continued Plaintiff's medication and scheduled him for a follow-up appointment in a month. ECF No. 25-1 at 103.

On April 17, 2015, Plaintiff was seen by Defendant Tuvera to follow-up on the x-ray of the skull and his foot pain. Kumar Decl. ¶ 17 and ECF No. 25-1 at 105. Defendant Tuvera examined Plaintiff's skull flap and found that it did not seem to move. Defendant Tuvera noted that Plaintiff did not have any focal neurological deficit. ECF No. 25-1 at 105. Defendant Tuvera advised Plaintiff that his brain was protected by the plates and screws. ECF No. 25-1 at 105. Plaintiff informed Defendant Tuvera that the x-rays showed non-union of his scalp bone flap. Defendant Tuvera did not submit an RFS for a neurosurgeon evaluation. ECF No. 61 at 30.

On July 31, 2015, Defendant Tuvera submitted an RFS for examination by a neurosurgeon and stated that the principal diagnosis was non-healing of the bone flap. ECF No. 25-1 at 108; ECF No. 61 at 56. Defendant Gamboa had the RFS returned to the PCP with directions to attach an IQ paper.[2] ECF No. 61 at 56.

On August 25, 2015, Plaintiff was seen by nurse practitioner Hanter. ECF No. 25-1 at 110. NP Hanter reported that Plaintiff was pushing for his neurosurgeon evaluation. ECF No. 25-1 at 110. NP Hanter submitted another RFS for examination by a neurosurgeon and stated that the

---

[2] IQ refers to the InterQual computer program which the CDCR uses to determine whether a patient meets certain objective medical criteria for a requested service. California Correctional Health Services Policies & Procedures, Vol. 4, Chap. 34.2; *see also Miller v. California Dep't of Corr. & Rehab.*, No. 16-CV-02431-EMC, 2018 WL 534306, at *12 (N.D. Cal. Jan. 24, 2018).

principal diagnosis was a loose craniotomy flap. ECF No. 61 at 57. The RFS was denied by Defendant Gamboa on the grounds that it did not meet the IQ criteria with the additional comment that an IQ should be submitted for headaches. ECF No. 61 at 57.

On March 2, 2016, SVSP Dr. Law San Fu issued an RFS for a routine CT head scan to follow-up on the x-ray indicating a loose skull flap. ECF No. 61 at 58. The RFS was approved the following day, and the CT scan was done the following day. ECF No. 61 at 58.

On April 27, 2016, Plaintiff filed the instant action. ECF No. 1.

### 2) Discussion

With respect to Defendant Tuvera's prescription of psychotropic medications, the Court finds that Plaintiff's suicidal ideations and depression constitute a serious medical need because a reasonable doctor or patient would find these issues worthy of treatment. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) ("Examples of serious medical needs include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'") (citing *McGuckin*, 974 F.2d at 1059-60). It is undisputed that Defendant Tuvera was aware that Plaintiff suffered suicidal ideations and depression when previously on psychotropic medications and that Plaintiff refused to take any psychotropic medications. Viewing the evidence in the light most favorable to Plaintiff, there is a genuine dispute as to whether Defendant Tuvera's prescription of psychotropic medications over Plaintiff's objections and given Plaintiff's history with psychotropic violated the Eighth Amendment.

With respect to the medical treatment provided Plaintiff in 2015 to 2016, the Court finds that, viewing the evidence in the light most favorable to Plaintiff, there is a genuine dispute as to whether the repeated denials in 2015 of the RFSs for a neurosurgeon examination and the failure to treat the loose skull flap violated the Eighth Amendment. Plaintiff's concern is not the medical treatment for his headaches, but rather the medical treatment (or lack thereof) for his loose skull flap. While Defendants appear to have made repeated and diligent efforts to determine the cause of Plaintiff's headaches, it can also be reasonably inferred from the evidence that they ignored

23

diagnostic tests showing a loose skull flap and doctor recommendations to have the flap assessed by a neurologist. Defendants' claim that they were unaware of his loose skull flap until late 2016 is contradicted by the record. The four 2015 RFSs list the loose skull flap as a principal diagnosis; Dr. Hetrick's reading of the 2014 CT scan concludes that there is likely a loose skull flap; and Dr. Harris' progress notes also clearly state that his physical examination indicated a loose skull flap. Moreover, the grounds for denying the RFSs are unclear at best. It is simply unclear why a scalp dermatology evaluation is more appropriate than a neurosurgeon consultation for a loose skull flap. Furthermore, while it is undisputed that Defendants regularly consulted specialists and ordered diagnostic tests, this does not establish, as a matter of law, that Defendants took reasonable steps to address Plaintiff's serious medical needs. The bulk of the appointments with the specialists took place prior to 2015, before a CT scan and doctors' examinations conclude that there is likely a loose bone flap, and Defendants failed to act to address the CT scan and the doctors' recommendations for a neurosurgeon examination.

Defendants are not entitled to summary judgment with respect to the medical treatment provided unless they are entitled to qualified immunity. *See Ortiz*, 884 F.2d at 1314 (summary judgment reversed where medical staff and doctor knew of head injury, disregarded evidence of complications to which they had been specifically alerted and without examination prescribed contraindicated sedatives).

> **b.** **Claims Regarding Processing of Healthcare Appeals (Defendants Bright, Gamboa, Kumar, Adams, Dunlap, Villafuerte, Talanoa, DelaRosa, Mejia, Turner and Ulloa)**

Defendants' argument that Defendants Bright, Gamboa, Kumar, Adams, Dunlap, Villafuerte, Talanoa, DelaRosa, Mejia, Turner and Ulloa are entitled to summary judgment relies on the argument that the medical care provided did not violated the Eighth Amendment. Specifically, they argue that because the determination of Plaintiff's grievances and staff complaints "merely affirmed the medical care provided by Plaintiff's primary physicians," the manner in which these defendants addressed Plaintiff's grievances and staff complaints did not violate the Eighth Amendment. As discussed *supra*, there is a genuine dispute as to whether Defendants' medical treatment violated the Eighth Amendment. If the medical treatment

provided, or not provided, to Plaintiff violated his Eighth Amendment right to be free from deliberate indifference to his serious medical needs, whether or not the defendants who processed Plaintiff's grievances and staff complaints also violated Plaintiff's Eighth Amendment right depends on whether the grievances made these defendants aware that Plaintiff faced a substantial risk of serious harm and whether these defendants took reasonable steps to abate this risk. Defendants have not addressed the liability of these defendants in depth. There is therefore a genuine dispute as to whether Defendants Bright, Gamboa, Kumar, Adams, Dunlap, Villafuerte, Talanoa, DelaRosa, Mejia, Turner and Ulloa's processing of Plaintiff's grievances and staff complaints violated the Eighth Amendment.

Defendants are not entitled to summary judgment with respect to their processing of Plaintiff's grievances and staff complaints unless they are entitled to qualified immunity.

## V.  Qualified Immunity

### A.  Standard

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a government official is entitled to qualified immunity, courts must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236.

"An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in original) (citation omitted). This is an "exacting standard" that "gives government officials breathing room to make reasonable but mistaken

judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* (alteration in original) (internal quotation marks omitted).

> [E]xisting precedent must have "placed beyond debate the unconstitutionality of" the officials' actions, as those actions unfolded in the specific context of the case at hand. *Taylor*, 135 S. Ct. at 2044. Hence, a plaintiff must prove that "precedent on the books" at the time the officials acted "would have made clear to [them] that [their actions] violated the Constitution." *Id.* at 2045.
>
> As the Supreme Court again stressed recently, "[t]he dispositive question is 'whether the violative nature of [the defendants'] particular conduct is clearly established.'" Moreover, "[t]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (emphasis added) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

*Hamby v. Hammond*, 821 F.3d 1085, 1090-91 (9th Cir. 2016) (alterations in original) (citations omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305 (2015)) (per curiam). The "fact-specific, highly contextualized nature of the 'clearly established' analysis" applies, regardless of the constitutional right at issue. *Hamby*, 821 F.3d at 1092.

## B. First Amendment Retaliation Claim

Defendants argue that Defendant Tuvera is entitled to qualified immunity because it is not clearly established that prescribing medication approved to treat an inmate's symptoms without forcing the inmate to take the medication and without refusing to discontinue the use of the medication violates an inmate's First Amendment right to be free from retaliation. As discussed *supra*, Defendants have mischaracterized his claim. The Court has found that, viewing the evidence presented in the light most favorable to Plaintiff, there is a dispute as to whether prescribing Plaintiff amitriptyline and Depakote to treat Plaintiff's headaches, given Plaintiff's objections and documented history of adverse reactions to psychotropic medications, reasonably advanced a legitimate correctional goal. Until this factual issue is resolved, it cannot be determined whether a reasonable physician in Defendant Tuvera's position could have believed that prescribing psychotropic was lawful in light of clearly established law and in light of the information he possessed at the time. Because resolution of this issue is critical to a proper determination of Defendant Tuvera's entitlement to qualified immunity, summary judgment on qualified immunity is inappropriate. *See, e.g., Glenn v. Washington County*, 673 F.3d 864, 870 (9th Cir. 2011). The Court DENIES Defendants' motion for summary judgment as to the First

Amendment retaliation claim.

### C. Eighth Amendment Claims

With regard to the Eighth Amendment claims, the same triable issues of fact that preclude summary judgment for Defendants also preclude summary judgment in their favor on the qualified immunity defense. Taking the evidence in the light most favorable to Plaintiff, it would be clear to a reasonable correctional medical care provider that an Eighth Amendment violation would occur if she or he failed to address a loose skull flap; prescribed psychotropic medications to an inmate knowing that he has previously suffered severe side effects from such medications; flushed an inmate's ear despite the inmate's obvious pain and pleas to stop; and refused to treat an inmate. *See, e.g., Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (summary judgment properly denied on qualified immunity defense to medical care providers who refused to provide a kidney transplant to an inmate; law was clearly established that Eighth Amendment was violated by deliberate indifference to medical needs). Summary judgment on qualified immunity for these Eighth Amendment claims is inappropriate. The Court DENIES Defendants' motion for summary judgment as to the Eighth Amendment claims.

### CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.     Defendants' motion for summary judgment is DENIED. ECF No. 25.

2.     The case is hereby REFERRED to Magistrate Judge Robert Illman for settlement proceedings pursuant to the Pro Se Prisoner Mediation Program. Such proceedings shall take place within 120 days of the date this order is filed, or as soon thereafter as Magistrate Judge Illman's calendar will permit. Magistrate Judge Illman shall coordinate a place, time and date for one or more settlement conferences with all interested parties and/or their representatives and, within fifteen days of the conclusion of all settlement proceedings, shall file with the Court a report thereon.

The Clerk is directed to serve Magistrate Judge Illman with a copy of this order and to notify Magistrate Judge Illman that a copy of the Court file can be retrieved from the Court's electronic filing database.

3.      In view of the referral, further proceedings in this case are hereby STAYED.  The Clerk shall ADMINISTRATIVELY CLOSE this case until further order of the Court.  If the case is not settled, the Court will enter a new scheduling order for further proceedings.

This order terminates ECF No. 25.

**IT IS SO ORDERED.**

Dated:  March 21, 2019



JON S. TIGAR
United States District Judge